**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LISA LOMBARDO,

                    *Plaintiff,*

          v.

EQUIFAX INFORMATION SERVICES LLC,
EXPERIAN INFORMATION SOLUTIONS,
INC., TRANS UNION LLC, and JPMORGAN
CHASE BANK, N.A.,

                    *Defendants.*

Civil Action No.: _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

Lisa Lombardo, Plaintiff herein, by her attorneys, allege and complain of Defendants as follows:

**PRELIMINARY STATEMENT**

1.        This is an action for actual, statutory, treble and punitive damages, injunctive relief, and statutory attorney's fees and costs brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), the New York Fair Credit Reporting Act, and the New York General Business Law § 380, et seq. ("NY FCRA"); New York Uniform Commercial Code, Article 2-A (Leases); New York General Business Law § 349 and for Breach of Contract.

2.        Specifically, the Defendants have damaged Plaintiff by reporting derogatory and obviously incorrect information regarding Plaintiff's auto lease with Defendant JP Morgan Chase Bank, N.A, which had financed the lease under the licensed tradename of Subaru Motors Finance (hereafter, "Chase" or "the Bank")

3.      Chase further damaged Plaintiff by unlawfully repossessing and disposing of her vehicle at the end of the lease after unlawfully refusing to allow Plaintiff to buy out the vehicle.

4.      The Defendants consist of three national credit reporting agencies: Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), and Trans Union LLC ("Trans Union") (collectively, the "CRA Defendants"); and a "furnisher[s] of information" to those agencies: JPMorgan Chase Bank, N.A. (the "Furnisher Defendant").

5.      Plaintiff discovered inaccurate derogatory information on her credit reports and disputed the same directly with the CRA Defendants who, in turn and upon information and belief, communicated the same to the Furnisher Defendant.

6.      The Furnisher Defendant is a "furnisher of information" within the meaning of the FCRA (15 U.S.C. § 1681s-2, *et seq.*).

7.      The Furnisher Defendant violated the FCRA by:

    a.  failing to conduct a reasonable investigation of Plaintiff's dispute(s),

    b.  failing to review all relevant information provided by consumer reporting agencies, and

    c.  failing to promptly modify, delete, or permanently block any information it could not verify as accurate, in violation of 15 U.S.C. §1681s-2(b)(1).

8.      The CRA Defendants violated the FCRA (and analogous provisions of the NY FCRA) by:

a.  failing to conduct a reasonable reinvestigation of Plaintiff's dispute(s) and delete or modify that information, in violation of § 1681i, and upon information and belief, failing to perform certain other related duties pursuant to and in violation of that same provision; and

b.  failing to maintain procedures to ensure the maximum possible accuracy of the information it reported about Plaintiff, in violation of § 1681e(b).

9.      As a direct and proximate result of the Defendants' negligent and willful actions, conduct, and omissions, including publishing inaccurate derogatory information to third-parties, Plaintiff suffered cognizable actual damages (both economic and non-economic) including but not limited to credit denials, provision of credit at higher interest rates, damage to her reputation, emotional distress, anxiety, depression, embarrassment, aggravation, and frustration.

10.     Each Defendant's willful violations of the Plaintiff entitles Plaintiff to an award of punitive damages.

## JURISDICTION AND VENUE

11.     The jurisdiction of this Court is conferred by 15 U.S.C. § 1681p, 15 U.S.C. § 1640(e), and 28 U.S.C. § 1331.

12.     This Court has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.     Venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions complained of took place in this

District and Defendants maintain offices, transact business, and are otherwise found in this District.

## **PARTIES**

14.      Plaintiff Lisa Lombardo is a natural person and a citizen of Stamford, Connecticut.

15.      Plaintiff maintained residences in both White Plains New York and Stamford, Connecticut at the time of many of the events in question.

16.      Plaintiff is an individual and "consumer" within the meaning of the FCRA, 15 U.S.C. § 1681a(c), as well as the NY FCRA, NY GBL § 380-a(b).

17.      Equifax Information Services LLC ("Equifax") is a Georgia limited liability company, duly authorized and qualified to do business in the State of New York.

18.      Experian Information Solutions, Inc. ("Experian") is an Ohio corporation, duly authorized and qualified to do business in the State of New York.

19.      Trans Union LLC ("Trans Union") is a Delaware limited liability company, duly authorized and qualified to do business in the State of New York.

20.      Equifax, Experian, and Trans Union are each a "consumer reporting agency" within the meaning of the FCRA (15 U.S.C. § 1681a(f)) and NY FCRA (G.B.L. § 380-a(e)).

21.      JPMorgan Chase Bank, N.A. ("Chase") is a national banking association, duly authorized and qualified to do business in the State of New York.

22.      Chase (the "Furnisher Defendant") is a "furnisher of information" within the meaning of the FCRA, 15 U.S.C. § 1681s-2, *et seq.*

**FACTS**

23.     On or about April 12, 2014, Plaintiff leased a 2014 Subaru Impreza VIN JF1GPAS62E8259914 (the "Vehicle") from Stamford Subaru in Stamford, Connecticut.

24.     The lease was offered and serviced by Chase.

25.     The terms of the lease were $400 per month for 36 months.

26.     Plaintiff and Chase subsequently agreed to an extension of the lease for six months.

27.     Plaintiff received a letter from Chase, dated April 21, 2017 confirming the lease extension.

28.     Plaintiff and Chase subsequently agreed to an additional extension of one month to facilitate her lease-end purchase of the vehicle.

29.     Specifically, in October 2017, concerned that the proposed lease buyout amounts kept changing and were incorrect, Plaintiff asked for a supervisor.

30.     The supervisor, Diane Sandoval, agreed that the lease would be extended by an additional 30-day extension in order to work through buyout related logistics and that buyout paperwork would be sent to Plaintiff.

31.     Plaintiff proffered payment for the additional month prior to that call and Chase accepted Plaintiff's payment.

32.     During the lease and the extensions, totaling 43 months, Plaintiff made all required payments timely.

33.     After her conversation with the supervisor in October 2017, Plaintiff received a letter and Itemization of Payoff for Lease Vehicle Purchase dated October 25, 2017 which stated a total purchase price of $12,027.60 "good through the payoff date, 11/04/2017and which, in its itemization *inter alia*, "Monthly Payments Due $0.0" and "Late Charges Due $0.0".

34.     Although the letter was address to Ms. Lombardo at her Connecticut address and the letter and itemization were sent to Plaintiff's Connecticut address, the lease buyout itemization sheet itself contained Ms. Lombardo's New York address and the tax calculations were New York-based.

35.     In addition, Chase had – despite Ms. Lombardo's instructions – sent the lease buyout documentation by a method that required signature upon delivery.

36.     Plaintiff had explicitly informed Chase that doing so would result in delay due to mail room procedures at her building.

37.     As a result, letter and itemization were received by Plaintiff only after the lease buyout date had lapsed and, in any event, was incorrect, *inter alia* because it contained a tax calculation that was incorrect, as well as other incorrect amounts.

38.     Plaintiff attempted to contact the Chase supervisor, Ms. Sandoval, to address these issues and receive a valid lease buyout letter, but was unable to reach her.

39.     Plaintiff then contacted the general number and was told that Ms. Sandoval was on vacation and would be in touch upon her return.

40.     Client continued attempting to contact Ms. Sandoval through November 2017 and received a call back from Ms. Sandoval on or about November 28, 2017.

41.     Ms. Sandoval instructed Ms. Lombardo that Chase would not allow her to purchase the vehicle because she had "missed the deadline" and that Ms. Lombardo was required to return the vehicle immediately, that same day, to the Stamford Subaru dealership ("the Dealership").

42.     Plaintiff offered to make a payment that same day, and Ms. Sandoval informed her that she would not be permitted to make a payment or to do a lease-end purchase.

43.     Plaintiff attempted to return the vehicle that same day, but Stamford Subaru refused to accept the car immediately.

44.     Instead, "Bobby" at Stamford Subaru said that it in order to return a vehicle an appointment would need to be scheduled in advance.

45.     Plaintiff was then transferred by "Bobby" to Luke Corcione in the Dealership's Finance Department.

46.     Mr. Corcione informed Plaintiff that, contrary to what Ms. Sandoval had said, he could easily arrange for the lease end purchase of the vehicle, as well as an auto loan to finance the lease-end purchase.

47.     Mr. Corcione took Plaintiff's personal and salary information, pulled her credit, received a dealer lease buyout quote from Chase over the phone, and further informed Plaintiff that he had received bank approval for a loan to finance

the purchase of the vehicle.  Mr. Corcione provided buyout and finance amount figures at that time.

48.    Mr. Corcione informed Plaintiff that she should come into the dealership in a few days to finalize the lease buyout and financing.

49.    Plaintiff returned with the vehicle to the Dealership a few days later, and Mr. Corcione claimed to be "too busy" to handle the paperwork that day and refused to finalize the deal that day.

50.    Plaintiff returned to the Dealership on December 2, 2017 and met with Mr. Corcione in the finance department.  Mr. Corcione informed Plaintiff that she "had nothing to worry about" and that he would call Plaintiff to set up a new appointment to finalize the buyout and financing.

51.    By letter dated December 2, 2017 and received by Plaintiff on or around December 16, Chase informed Plaintiff that Plaintiff had a "past due balance of $11,291.70."

52.    Plaintiff called the number appearing on the letter for clarification and was informed by the Chase representative, Jason at the "Chase Auto Finance Recovery Department" that the account had been charged off.

53.    Jason informed Plaintiff that her account was charged off because her lease had ended in April.

54.    Plaintiff pointed out that she and Chase had, in fact, extended the lease but Jason refused to accept her position and repeated that the lease was over in April 2017 and the car due to be returned to Chase at that time.

55.     For this reason, Jason informed her, the account was in default as of April, 2017 and the charge off was valid.

56.     Jason further informed her that the charge off would be reported by Chase to the credit bureaus even if she made the requested payment because she hadn't returned the car in April, 2017.

57.     Plaintiff asked to escalate the matter and was referred to the Chase Executive Office, where she spoke with "Sheri Jensen" and "Greg Riffell".

58.     Plaintiff described the situation in detail to the Chase Executive Office, who informed her that the Executive Office would investigate.

59.     In January 2018, Greg Riffell informed Ms. Lombardo over the phone that Chase would not repossess the car until the Chase Executive Office had completed its investigation.

60.     Notwithstanding this representation, Ms. Lombardo was contacted by a repossession company on or about February 6, 2018.

61.     Plaintiff summarized the issues on a phone call with the repossession company and was transferred to Chase.

62.     The Chase representative apologized, informed her that the matter was still under investigation and stated that the vehicle would not be repossessed during the pending investigation.

63.     The repossession company left without the vehicle.

64.     The vehicle was repossessed the following day, on or about February 7, 2018.

65.     Left without a car and with severely damaged credit, Plaintiff was forced to rent vehicles regularly from the time of the repossession until September 2018.

66.     Following the repossessions of the Vehicle, Plaintiff received a variety of collection letters from Chase and from third party collectors collecting on Chase's behalf.

67.     These dunning notices provided inconsistent explanations as to what was owed.

**Credit Reporting Disputes**

**A.  Equifax**

68.     By letter dated November 15, 2018, Plaintiff disputed her credit report with Equifax, stating that the account was inaccurately listed as charged off and with a balance owing of $11,291.00.

69.     Plaintiff's letter to Equifax stated that the account was paid in full and included, *inter alia*, copies of her 43 consecutive timely payments.

70.     Equifax responded by letter dated November 29, 2018, stating that the information in question had been updated.

71.     Equifax's November 29, 2018 letter contained updated information regarding the account, stating a "Balance Amount" and "Amount Past Due" of $2,256; a "Date of Last Payment" of September, 2018 (some 9 months after the extended lease was to have expired, and 7 months after the car was repossessed, and a date on which no payment had been made), a "Date of 1st Delinquency" of "11/2018" (again, long after any of the events in question), and a "Charge Off Amount" of zero.

72.     By letter dated May 29, 2019, Plaintiff again disputed her credit report with Equifax.

73.     That dispute was detailed and recounted, *inter alia*, that Plaintiff had extended her lease and made all payments timely.

74.     The May 29 dispute letter to Equifax contained the following chart:

|                          | 12/19/17 | 9/7/18  | 11/29/18 |
|--------------------------|----------|---------|----------|
| Months reviewed          | 44       | 44      | 44       |
| Charge-off               | yes      | yes     | no       |
| Charge-off amount        | $11,291  | $11,291 | $0       |
| Days late                | none     | none    | 30-59    |
| Balance                  | $11,291  | $11,291 | $2,256   |
| Date of First delinquency| 11/2017  | 4/1/17  | 11/2018  |

75.     The dispute letter detailed how the reported date of first delinquency continued to change, first moving back to April 2017 in the September 2018 credit report (*i.e.* as if there had been no lease extension), and then re-aging to November 2018 (approximately a year after the end of the extended lease and some 9 months after the vehicle was repossessed.

76.     The letter was sent via certified mail on June 3, 2019 and was received by Equifax on June 7, 2019.

77.     Equifax responded to Plaintiff's dispute by letter dated July 26, 2019, informing Plaintiff that it had changed various information.

78.     Specifically, as set forth in the July 26, 2019 letter, Equifax changed the date of delinquency to November 2017, and changed the "status" back to "Charge Off".

79.     Inexplicably, Equifax also changed the balance, amount past due and charge off amount as zero dollars.

80.     Thus, Equifax failed to correct Plaintiff's credit report, and in fact made matters worse, categorizing the account as charged off where, immediately prior to the dispute, it was reporting the account merely as late (which was also derogatory and incorrect).

**B.  Experian**

81.     By letter dated November 25, 2018, Plaintiff disputed her credit report with Experian, stating that the account was inaccurately listed as charged off.

82.     Plaintiff's letter to Experian stated, *inter alia*, that the account was paid in full and included, inter alia, copies of her 43 consecutive timely payments.

83.     Experian responded by letter dated December 10, 2018, stating that the information in question had been updated.

84.     Experian's letter included various updates to Plaintiff's address, telephone and other personal information and listed the account in question as an adverse account, stating as follows regarding the account's status: "Open, $2,256 past due as of Nov 2018.  By Aug 2025 this account is scheduled to go to a positive status."

85.     The adverse information for the account also included the following: "Comment: Full termination/balance owing."

86.     By letter dated December 26, 2018, Experian noted that the information set forth above was posting "Before dispute" and noted that "After dispute" the account status was: "Account charged off/Never late.  $11,291 written off. $2,556 past due as of December 2018.  This account is scheduled to continue on record until Sep 2025."

87.     Thus, Experian's response resulted in even more erroneous and incorrect reporting on the account than had previously been the case.

88.     By letter dated May 29, 2019, Plaintiff again disputed her credit report with Experian.

89.     This dispute letter was mailed via certified mail on June 3, 2019 and received by Experian on June 10, 2019.

90.     Plaintiff's Experian dispute was detailed and recounted, *inter alia*, that Plaintiff had extended her lease and made all payments timely.

91.     The dispute letter to Experian recounted Chase's inconsistent and incorrect reporting of the account, including how Plaintiff's December credit report, had re-aged a purported balance to Chase of $2,556.

92.     Experian responded by letter dated June 22, 2019, in which it stated that "information you disputed has been verified as accurate; however, information unrelated to your dispute has been updated."  Both the pre-and post dispute tradelines list "Date of Status" as December, 2018.

93.     Experian further stated that it was previously listing the status of the account as "Account charged off/Never late; $11,291 written off. $2,556 past due as of Dec 2018".

94.     Experian further indicated that, following Plaintiff's dispute letter, this description (which makes no sense on its face) would continue.

## C. **Trans Union**

95.     By letter dated November 10, 2018, Plaintiff disputed her credit report with TransUnion, stating that the account was inaccurately listed as charged off and with a balance owing of $11,291.00.

96.     Plaintiff's letter to Trans Union stated that the account was paid in full and included, inter alia, copies of her 43 consecutive timely payments.

97.     Trans Union responded by letter dated November 29, 2018, stating that the information in question had been updated.

98.     The updated tradeline describes the "Pay Status: as "Account 30 days Past Due Date"; with a balance of "$2,256".  The account response further describes the account as having a "Maximum Delinquency of 30 days in 11/2018 for $2,256".

99.     By letter dated May 29, 2019, Plaintiff again disputed her credit report with Trans Union.

100.    That dispute was detailed and recounted, *inter alia*, that Plaintiff had extended her lease and made all payments timely.  The letter provided additional details regarding Chase's refusal to allow Plaintiff to purchase her vehicle at the end of the lease and Chase's improper and abrupt charge-off of the account. The letter described and attached credit reports, showing Trans Union's inconsistent reporting on the account, including that the account was reporting as of 10/29/2017 as having been paid timely from inception through October

2017, but that Trans Union had subsequently reported the account as having been closed and charged off in November 2017, with an unpaid balance of over 11,000 dollars, only to later change the report to list the account as 30 days late (rather than charged off),  and with a balance owing of just over $2,200 and an "original Charge-off" amount of zero.

101.     The letter was sent via certified mail on June 3, 2019 and was received by TransUnion on June 6, 2019.

102.     TransUnion responded to Plaintiff's dispute by letter dated June 21, 2019, informing Plaintiff that it had changed various information.  Specifically, Trans Union inexplicably responded, *inter alia*, by changing the account status back to "Charged Off" and changing the "Original Charge-off" amount from zero to $11,291.

103.     Thus, TransUnion failed to correct Plaintiff's credit report, and in fact made matters worse, categorizing the account as charged off whereas, immediately prior to the dispute, it was reporting the account merely as late (which was also derogatory and incorrect).

## **Damages**

104.     Plaintiff has suffered a variety of actual damages as a result of Defendants' misconduct, including but not limited to the following:

105.     Plaintiff has suffered repeated credit denials as a result of Defendant's misconduct.

106.     Plaintiff has suffered increases in her credit card rates and lost credit card, auto financing and home loan opportunities as a result of Defendants' misconduct.

107.     Plaintiff has suffered actual damages in the form of loss of her vehicle and the cost of alternative transportation.

108.     Plaintiff has suffered actual damages in the form of her supposed debt to Chase, upon which Chase continues to seek to collect, including by means of third-party debt collectors.

109.     Plaintiff has suffered the loss of her personal possessions in connection with the unlawful repossession of the Vehicle;

110.     Plaintiff has suffered loss of income that is the result of taking time off to attempt to address Defendants' misconduct, and due to loss of transportation;

111.      Plaintiff has suffered costs associated with arranging for alternate transportation and during the relevant time periods, and has incurred costs of cover including in connection with purchase of a replacement vehicle.

112.     As a result of Defendants' misconduct, Plaintiff has suffered emotional distress, sleeplessness, anxiety, depression, embarrassment, aggravation, and extreme frustration.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF FCRA § 1681s-2(b)**
**Against JPMorgan Chase Bank, N.A.**

113.     Plaintiff realleges and incorporates the above paragraphs as if reasserted and realleged herein.

114.     Congress enshrined within the FCRA the "need to ensure that consumer
reporting agencies exercise their grave responsibilities with fairness,
impartiality, and a respect for the consumer's right to privacy."  15 U.S.C.
§1681(a)(4).

115.     Congress stated plainly the purpose of the FCRA, namely "to require that
consumer reporting agencies adopt reasonable procedures for meeting the needs
of commerce for consumer credit, personnel, insurance, and other information in
a manner which is fair and equitable to the consumer, with regard to the
confidentiality, accuracy, relevancy, and proper utilization of such information .
. . ."  15 U.S.C. §1681(b).

116.     The Furnisher Defendant violated §1681s-2(b) by its acts and omissions,
including, but not limited to:

    a.  failing to conduct a reasonable investigation of Plaintiff's dispute(s),

    b.  failing to review all relevant information provided by consumer
reporting agencies, and,

    c.  failing to promptly modify, delete, or permanently block any
information it could not verify as accurate, in violation of §1681s-
2(b)(1).

117.     As a result of the Furnisher Defendant's violations of §1681s-2(b)(1),
Plaintiff suffered actual damages including but not limited to loss of credit,
damage to reputation, embarrassment, humiliation, anguish and the other
damages set forth herein.

118.    These violations of §1681s-2(b)(1) were willful, rendering the Furnisher

Defendant liable for actual damages, statutory damages, costs and reasonable

attorney's fees, and punitive damages in an amount to be determined by the

Court pursuant to 15 U.S.C. §1681n.

119.    In the alternative, the Furnisher Defendant was negligent, entitling

Plaintiff to recover actual damages, costs, and reasonable attorney's fees

pursuant to 15 U.S.C. §1681o.

**SECOND CAUSE OF ACTION**
**VIOLATIONS OF FCRA § 1681e(b) and § 1681i**
**Against the CRA Defendants**

120.    Plaintiff realleges and incorporates the above paragraphs as if reasserted

and realleged herein.

121.    The CRA Defendants each violated multiple sections of 15 U.S.C. §

1681i by its acts and omissions including but not limited to:

a.  failing to conduct a reasonable reinvestigation to determine whether the

disputed information is inaccurate and record the current status of the

disputed information or delete the item from Plaintiff's credit file in

violation of § 1681i(a)(1);

b.  by failing to review and consider all relevant information submitted by

Plaintiff in violation of § 1681i(a)(4); and

c.  by failing to properly delete the disputed inaccurate items of information

from Plaintiff's credit files or modify item of information upon a lawful

reinvestigation in violation of § 1681i(a)(5).

122.     Each of the CRA Defendants violated 15 U.S.C. § 1681e(b) by their conduct, acts and omissions including but not limited to failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff in the preparation of her credit reports and credit files that they published and maintained.

123.     As a result of the CRA Defendants' violations of § 1681i and §1681e(b), Plaintiff suffered actual damages including but not limited to: loss of credit, damage to reputation, embarrassment, humiliation, anguish and the other damages set forth herein.

124.     These violations of § 1681i and § 1681e(b) were willful, rendering the CRA Defendants liable for actual damages, statutory damages, costs and reasonable attorney's fees, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

125.     In the alternative, the CRA Defendants were negligent, entitling Plaintiff to recover actual damages, costs and reasonable attorney's fees pursuant to 15 U.S.C. §1681o.

**THIRD CAUSE OF ACTION**
**VIOLATIONS OF NY FCRA §380-f and §380-j**
**Against the CRA Defendants**

126.     Plaintiff realleges and incorporates the above paragraphs as if reasserted and realleged herein.

127.     Each of the CRA Defendants violated multiple sections of the NY FCRA (NY GBL §§ 380–380-u) by their acts and omissions including:

a. failing to promptly reinvestigate Plaintiff's dispute(s) to determine whether the disputed information is inaccurate and record the current status of the disputed information in violation of § 380-f(a);

b. failing, after determining that the disputed information is in error or that it can no longer be verified, to promptly expunge the item and otherwise correct the file and refrain from reporting the item in subsequent consumer reports, in violation of § 380-f(b); and

c. failing to establish and/or to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff in the preparation of her credit report and credit files that it published and maintained in violation of § 380-j(e).

128.    These violations of § 380-f and § 380-j(e) were willful, rendering the CRA Defendants liable for actual damages, costs and reasonable attorney's fees, and punitive damages in an amount to be determined by the Court pursuant to § 380-l and entitling Plaintiff to injunctive relief restraining Defendants from any further violations of Plaintiff's rights pursuant to the NY FCRA.

129.    In the alternative, the CRA Defendants were negligent, entitling Plaintiff to recover actual damages and costs and reasonable attorney's fees pursuant to § 380-m as well as injunctive relief restraining Defendants from any further violations of Plaintiff's rights pursuant to the NY FCRA.

## FOURTH CAUSE OF ACTION
## VIOLATION OF NEW YORK UNIFORM COMMERCIAL CODE ARTICLE 2-A
### Against JPMorgan Chase Bank, N.A.

130.     Plaintiff realleges and incorporates the above paragraphs as if reasserted and realleged herein.

131.     Chase is a lessor as defined under Article 2-A-103(1)(p).

132.     Plaintiff is a Lessee as defined under Article 2-A-103(1)(n).

133.     The Vehicle that Plaintiff leased from Chase was primarily for Plaintiff's personal, family and/or household purposes.

134.     The agreement between Chase and the Plaintiff was "Consumer Lease" as defined under Article 2-A-103(1)(e).

135.     Chase's refusal to allow Plaintiff to purchase the Vehicle at the end of the extended lease term, as well as its repossession of the Vehicle constituted repudiation of Plaintiff's lease.

136.     As a result, Plaintiff is entitled, *inter alia*, cost of cover and to recover damages, costs and attorney's fees.

## FIFTH CAUSE OF ACTION
## BREACH OF CONTRACT
### Against JPMorgan Chase Bank, N.A.

137.     Plaintiff realleges and incorporates the above paragraphs as if reasserted and realleged herein.

138.     The Lease Agreement between Plaintiff and the Bank was a written contract.

139.     Pursuant to that contract, Plaintiff was entitled to purchase the Vehicle at lease-end.

140.    The Bank did not allow Plaintiff to purchase the Vehicle and unlawfully

repossessed the vehicle, and thus violated the contract between the parties.

141.    These material breaches of the contract caused Plaintiff pecuniary and

non-pecuniary damages, as outlined in the instant Complaint, and the costs of

the action.

**SIXTH CAUSE OF ACTION**
**NEW YORK GENERAL BUSINESS LAW § 349**
**Against JPMorgan Chase Bank, N.A.**

142.    Plaintiff realleges and incorporates the above paragraphs as if reasserted

and realleged herein.

143.    Chase's practice of stating that it is investigating consumer's auto leasing

and auto financing disputes but failing to conduct a bona fide investigation

violated NYGBL § 349 independent of whether this practices constitutes

violations of any other law, including common law.

144.    This practice is deceptive and was committed in conduct of business,

trade, commerce or the furnishing of a service in this state.

145.    This practice is consumer-oriented.

146.    Defendant's conduct was not a unique, one-time occurrence without

possibility of replication or recurrence and without implication for the broader

consuming public, but rather is highly capable of repetition and could be used

against any other consumer attempting to buy a certified used vehicle from

Defendants.

147.    Indeed, on information and belief, Defendants' willfully and knowingly

engage in the deceptive tactics set forth herein on a regular and recurring basis.

148.     Defendants' conduct and/or statements were materially misleading.

149.     As a result of these violations of NYGBL §349, Plaintiff suffered actual damages.

150.     For these reasons, Plaintiff is entitled to actual damages, three times actual damages up to $1000, punitive damages, costs and reasonable attorneys' fees.

**WHEREFORE**, Plaintiff seeks judgment in Plaintiff's favor and damages against Defendants:

a.  awarding Plaintiff actual damages, statutory damages, punitive damages, treble damages, costs and reasonable attorney's fees as against each Defendant;

b.  ordering Defendants to immediately delete all inaccurate information from Plaintiff's credit reports and files and cease reporting the inaccurate information to any and all persons and entities to whom they report consumer credit information, and to send updated and corrected credit report information to all persons and entities to whom they have reported inaccurate information about Plaintiff;

c.  enjoining Defendants from violating Plaintiff's NY FCRA rights and from all other unlawful conduct set forth herein; and

d.  such other and further relief as may be necessary, just, and proper.

**{Continued on Next Page}**

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a trial by jury as to all issues so triable.

Dated: August 24, 2020

> /s/ Daniel A. Schlanger
> Daniel A. Schlanger
> Schlanger Law Group LLP
> 80 Broad Street, Suite 1301
> New York, NY 10004
> T: 212-500-6114
> F: 646-612-7996
> E: dschlanger@consumerprotection.net
>
> *Counsel for Plaintiff*