UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
LISA LOMBARDO,                                    :
                  Plaintiff,              :

v.                                                :

JPMORGAN CHASE BANK, N.A.,                         :
                  Defendant.              :
------------------------------------------------------------x

**OPINION AND ORDER**

20 CV 6813 (VB)

Briccetti, J.:

Plaintiff Lisa Lombardo, now proceeding pro se, brought this action against defendant

JPMorgan Chase Bank, N.A. ("Chase"), alleging Chase violated the Fair Credit Reporting Act

("FCRA"), 15 U.S.C. § 1681 et seq., and the Connecticut Uniform Commercial Code, and

breached the terms of an automobile lease agreement, when it prematurely designated the lease

as charged off on plaintiff's credit report and subsequently repossessed the vehicle. Plaintiff and

Chase settled the case for ███████ in 2024, and the Court granted Chase's motion to enforce the

settlement on March 5, 2025. (Doc. #311).

From the commencement of this litigation until November 7, 2024, plaintiff was

represented by interested party Schlanger Law Group, LLP ("Schlanger"). Beginning September

2, 2021, pursuant to a co-counsel agreement with Schlanger, plaintiff was also represented by

Lupkin PLLC ("Lupkin"). Both Schlanger's and Lupkin's representation of plaintiff was

terminated when the Court granted counsel's joint motion to withdraw and fix a charging lien, in

an amount to be determined. (Doc. #270).

1

Now pending is Schlanger's motion to fix the amount of the charging lien at ███████.

(Docs. ##331, 341, 345)..[1]  Schlanger also seeks an order directing Chase to pay that amount to Schlanger directly. (Id.).  Plaintiff opposes Schlanger's motion. (Doc. #351).

For the reasons set forth below, the motion is GRANTED.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1367.

## BACKGROUND

The Court assumes familiarity with the underlying facts and recounts only the background and procedural history relevant and necessary to resolve the instant motion.

Plaintiff retained Schlanger on March 3, 2020. (Doc. #347-5 "Retainer").[2]  Plaintiff and Schlanger's retainer agreement provided Schlanger "may opt to receive compensation on an hourly basis . . . OR [Schlanger] may opt to receive a sum equal to 30% of any amount recovered" in the litigation. (Retainer at ECF 2).  The Retainer explained Schlanger "shall utilize whichever of these two options results in higher compensation" to Schlanger. (Id.).  It also provided the hourly rates of partners, associates, and support staff at the firm. (Id.).

In addition, the Retainer specified that, although Lombardo was "entitled to know exactly what the Attorneys' fee will be prior to accepting any settlement offer . . . Attorneys' fees will come out of the settlement amount, regardless of whether or not any portion of the settlement

---

[1]    Schlanger filed this motion and accompanying documents in triplicate: (i) public redacted versions, (ii) sealed, partially redacted versions, and (iii) sealed, unredacted versions. For purposes of the instant motion, the Court will refer to the unredacted, sealed versions of Schlanger's filings. (Docs. ##341–43, 348, 361–62).

[2]    Schlanger contends plaintiff retained Schlanger on March 3, 2020. (Doc. #342 at 4). Plaintiff electronically signed the retainer on March 3, 2020. (Doc. #347-5 at ECF 9). However, the agreement itself is dated March 2, 2020. (Id. at ECF 8). Because the discrepancy is not significant to the instant motion, the Court will refer to March 3, 2020, as the date on which the retainer agreement was signed and executed. In addition, "ECF" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

amount is designated for attorney's fees." (Id. at ECF 3). The Retainer noted Lombardo was "aware that the Attorneys' fees paid in this matter may significantly exceed the compensation to [Lombardo]." (Id.). And the Retainer "authorize[d] [Schlanger] to retain associate counsel and co-counsel on [Lombardo's] behalf at [Schlanger's] discretion and without further notice." (Id.). Finally, pursuant to the Retainer, Lombardo "grant[ed] [Schlanger] an enforceable lien for its fees, costs and disbursements . . . against the proceeds of any future settlement[.]" (Id. at ECF 4).

On August 24, 2020, plaintiff brought this case against Chase, as well as Equifax Information Services, LLC ("Equifax"), Trans Union, LLC ("Trans Union"), and Experian Information Solutions, Inc. ("Experian" and together with Equifax and Trans Union, the "Credit Reporting Agency Defendants").

On August 31, 2021, Jonathan Lupkin entered an appearance for plaintiff. (Doc. #76). On September 2, 2021, Schlanger and Lupkin executed a co-counsel agreement. (Doc. #360-3). The co-counsel agreement specified Schlanger would "be the primary liaison with Ms. Lombardo." (Id. at ECF 2). It also provided for the method of distributing fees between Schlanger and Lupkin, with 25% of fees after costs going to Schlanger, 20% going to Lupkin, and "the remainder being split pro rata according to each firm's recorded hours." (Id. at ECF 2–3). Although Schlanger and Lupkin failed to disclose the co-counsel agreement to plaintiff, due to what Schlanger calls "an inadvertent clerical error" (Doc. #360 at ¶ 36), plaintiff was made aware of Lupkin's role as co-counsel by no later than November 30, 2021. (Doc. #360-1 at ECF 2).

Early in 2022, plaintiff settled with the Credit Reporting Agency Defendants and those defendants were dismissed from the case. (Docs. ##122, 131, 146). Plaintiff settled with

Equifax for ██████, with Trans Union for ██████, and with Experian for ██████. (Doc. #342 at 6). Plaintiff and counsel split the Equifax and Trans Union settlements equally, each taking ██████. (Id.). Plaintiff retained ██████ of the Experian settlement, and counsel received ██████. Thus, of the ██████ recovered in total by plaintiff's settlement with the Credit Reporting Agency Defendants, she kept ██████ and counsel was paid ██████. (Id.). These settlements did not include any provisions or protections regarding how plaintiff would be taxed with respect to portions of the settlements recoverable by her counsel as attorneys' fees.

On November 28, 2022, Chase moved for summary judgment. (Doc. #164). On July 21, 2023, the Court granted in part and denied in part Chase's motion. (Doc. #196). Thereafter, the parties engaged a retired judge to privately mediate their dispute. (Doc. #208).

On January 15, 2024, plaintiff, her attorneys Daniel A. Schlanger and Stephanie Tatar,[3] as well as defense counsel, attended a daylong mediation session. Towards the end of the day, the mediator informed plaintiff and her counsel that Chase had made a final offer. Plaintiff confirmed her willingness to accept the offer to Mr. Schlanger, who reported plaintiff's acceptance to the mediator. (Doc. #294 at ¶¶ 6, 13). The mediator emailed Chase's counsel that night, stating "I am very pleased that we were able to settle this matter." (Doc. #228-3).

On January 17, 2024, the parties jointly filed a notice of settlement stating they had "reached a settlement" and were "in the process of finalizing the relevant settlement documents." (Doc. #210). The following day, Mr. Schlanger emailed Chase's counsel requesting two separate checks be issued as part of the settlement agreement—one to plaintiff for 20% of the total

---

[3]    Ms. Tatar has not entered an appearance for plaintiff and it is unclear whether she ever entered into a formal co-counsel agreement with Schlanger. However, Tatar participated in preparations for plaintiff's mediation with Chase and attended the mediation. (Docs. ##280, 351 at ECF 14). Nevertheless, Schlanger has not included Tatar's time in the lodestar totals.

settlement amount, and the other to Schlanger for the remaining 80%. Plaintiff later claimed the foregoing did not constitute a binding settlement.

Plaintiff's objections to the settlement stemmed in part from Schlanger's requested attorneys' fees. On January 22, 2024, plaintiff emailed Mr. Schlanger: "The 80% that you proposed to take from the Chase settlement seems out of the norm, especially in light of the previous settlements with the credit reporting agencies. Can you explain to me how you arrived at that figure?" (Doc. #294-2). Mr. Schlanger responded the next day, writing plaintiff had agreed to that split at the mediation and approved the settlement accordingly. (Doc. #294-3).

Beginning January 22, 2024, Mr. Schlanger and Chase's counsel exchanged drafts of the settlement agreement and negotiated proposed changes. The final draft settlement agreement was sent to plaintiff on March 18, 2024, for her signature. That agreement did not address any tax protection language or a split regarding attorneys' fees. Following further negotiations aimed at alleviating plaintiff's concerns that she would be unfairly taxed for the entire settlement amount, on April 19, 2024, Schlanger informed the Court that Lombardo no longer wished to finalize the settlement. (Doc. #216). Thereafter, plaintiff retained fee dispute counsel (Doc. #221 at Tr. 6), although such counsel has yet to enter an appearance.

On July 16, 2024, Chase moved to enforce the settlement. (Doc. #227). On August 7, Schlanger and Lupkin moved to withdraw as counsel. (Doc. #239). The Court granted the latter motion on November 7, 2024, and also granted Schlanger and Lupkin a charging lien, in an amount to be determined later. (Doc. #270). On December 2, 2024, Schlanger moved to intervene for purposes of joining Chase's motion to enforce. (Doc. #273). On March 5, 2025, the Court granted Chase's motion to enforce the settlement, but again declined to determine the

amount of the charging lien.  (Doc. #311).  Plaintiff's subsequent motion for reconsideration was denied.  (Docs. ##312, 323).

On July 5 and July 8, 2025, plaintiff and Mr. Schlanger attended mediation sessions regarding their fee dispute, but the mediation was unsuccessful.  Accordingly, on September 16, 2025, Schlanger filed the instant motion to fix the amount of the charging lien.  (Doc. #341).  Plaintiff opposes the motion.  (Doc. #351).

## DISCUSSION

I.    Legal Standard

"A charging lien is an equitable interest in a client's cause of action." Villar v. City of New York, 546 F. Supp. 3d 280, 289 (S.D.N.Y. 2021).[4]  Section 475 of New York's Judiciary Law, which governs attorneys' charging liens provides:

> From the commencement of an action . . . the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a . . . settlement . . . in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination.  The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y. Jud. L. § 475.

A lien created by Section 475 "is enforceable in federal courts in accordance with its interpretation by New York courts." Minott v. Google LLC, 2024 WL 3518525, at *2 (S.D.N.Y. Jul. 24, 2024) (citing Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 448–49 (2d Cir. 1998)).  "Federal courts have supplemental jurisdiction over motions to fix charging liens under [Section] 475." Id.  It is within the sound discretion of the trial court to determine the

---

[4]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

6

reasonable value of an attorney's services. <u>Winkfield v. Kirschenbaum & Phillips, P.C.</u>, 2013 WL 371673, at *2 (S.D.N.Y. Jan. 29, 2013).

Crucially, "[t]he theory of <u>quantum meruit</u>, rather than the retainer agreement,[5] is the basis for determining the amount at which to fix the charging lien. Therefore, in determining the amount of a charging lien, courts should consider the <u>quantum meirut</u> factors such as the hourly rates typically employed in the district, as well as "the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained[.]" <u>Sequa Corp. v. GBJ Corp.</u>, 156 F.3d 136, 148 (2d Cir. 1998). In addition, courts should "consider the rate a reasonable, paying client would pay and use that rate to calculate the presumptively reasonable fee." <u>Minott v. Google LLC</u>, 2024 WL 3518525, at *4. "Hours that the court finds excessive, redundant, or vague are to be excluded, and courts have discretion to simply deduct a percentage of hours from the fee application." <u>Id</u>.

After analyzing the <u>quantum meruit</u> factors, courts may use a "lodestar analysis to reach a specific dollar figure." <u>Sequa Corp. v. GBJ Corp.</u>, 156 F.3d at 148. It is well settled that the "lodestar approach is sufficiently congruent with the criteria applicable under New York law to justify such a choice in calculation methodology." <u>Id</u>. at 148–49. Lodestar analysis "results in a presumptively reasonable fee, which is calculated by multiplying the number of hours reasonably billed by the appropriate hourly rate." <u>Hampshire Grp. Ltd. v. Scott James Co., L.L.C.</u>, 2015 WL 5306232, at *16 (S.D.N.Y. July 27, 2015) (<u>report and recommendation</u>).

---

[5] "Although a court is not bound by the parties' retainer agreement, it may still use such agreement as guidance in determining the reasonable value of the services provided." <u>Minott v. Google LLC</u>, 2024 WL 3518525, at *4.

II.    Analysis

Schlanger asks the Court to fix the amount of the charging lien at ▉▉▉▉. (Doc. #342 at 1). Schlanger says that, together with Lupkin, counsel expended a total of 1,754 hours on plaintiff's case, which would result in a total fee of ▉▉▉▉ if charged at the hourly rates provided in the retainer. (Id.). Schlanger thus contends its requested ▉▉▉▉ charging lien is reasonable, both in light of the actual value of the work and the quantum meruit factors.

The Court agrees.

Plaintiff opposes the motion on several grounds, including her belief that the Court cannot fix the amount of the charging lien "until the fee dispute between Plaintiff and [Schlanger] has been litigated." (Doc. #351 at 3). This argument is unavailing.

There no longer is any dispute about Schlanger and Lupkin's entitlement to a charging lien. The Court granted the lien more than a year ago. (Doc. #270). At that time, and subsequently, the Court explained the amount of the charging lien would be determined at a later date. (Id. at 9–10, Doc. #311 at 7). Since then, plaintiff and Mr. Schlanger have appeared for two status conferences as well as a mediation session to discuss Schlanger's attorneys' fees and the amount of the charging lien. At the July 22, 2025, status conference, the Court set a briefing schedule to determine the amount of the lien. (Doc. #328). The sole purpose of Schlanger's instant motion is to resolve the fee dispute between plaintiff and Schlanger by fixing the amount of the charging lien. Plaintiff's opposition to Schlanger's motion was her opportunity to litigate this issue. The Court will resolve the motion and will not order additional briefing or argument.

A.    Quantum Meruit Factors

Turning first to the quantum meruit factors, Schlanger's requested lien amount is reasonable. Plaintiff's case was complicated. It involved FCRA claims against four defendants, convoluted and potentially harmful facts on plaintiff's side, and extensive fact and expert

8

discovery. As Schlanger points out, the Court has previously acknowledged the complexities in this atypical FCRA case and the "mishmash" of responsibility between plaintiff and defendants, which meant all parties had real litigation risk in taking the case to trial. (Doc. #201 at Tr. 26–27).

Nevertheless, plaintiff contends Schlanger is exaggerating the complexity of the case to secure a larger charging lien. Specifically, plaintiff argues if her case was so risky and complex Mr. Schlanger would not have "urged her to retain him and file suit" or, at the very least, that he should have warned her of the extent of the risk before she retained him. (Doc. #351 at 24). She further claims the risk was reduced because of information about Chase's business practices provided to Schlanger by a Virginia-based attorney with prior experience in a similar case, with whom plaintiff was in touch before retaining Schlanger. (Id.).

These arguments miss the point. Risk and complexity do not mean a case should not be brought, and plaintiff offers no evidence to show Mr. Schlanger—or any other attorney at his firm—failed to discuss the risks of this litigation with her. Instead, Schlanger has offered evidence showing plaintiff was aware of how hard-fought and risky litigation might be. (Docs. ##343-2, 343-3). Moreover, although Schlanger may have received advice from another attorney regarding a similar litigation against Chase, such advice could not ameliorate the various factual and expert discovery issues presented in plaintiff's particular case. FCRA cases are generally complex and time-intensive. Rubin v. HSBC Bank USA, NA, 763 F. Supp. 3d 233, 244 (E.D.N.Y. 2025). Here, plaintiff's conduct, including her choice to retain the vehicle at issue longer than she should have, was an additional source of complexity, as was the weakness of her non-credit-related damages.

Despite these difficulties, Schlanger and Lupkin obtained good results for plaintiff, owing to the quality of performance and the qualifications of their highly experienced attorneys. (See Doc. #348).[6] The total settlement amounts greatly exceed the amount plaintiff's own expert valued as her provable credit loss damages. (Doc. #186-15 at 8). Schlanger successfully opposed Chase's motion for summary judgment and secured four settlements for plaintiff amounting to a total of ███████. These are good outcomes in a difficult case. Moreover, the case has been hard fought for over five years now, four of which Schlanger served as plaintiff's counsel. In that time, Schlanger conducted extensive discovery and engaged in multiple settlement negotiations with numerous parties. And Schlanger has also assisted the Court by its intervention in Chase's motion to enforce the settlement.

In addition, although it is not dispositive, the lien amount is reasonable in light of the Retainer Agreement. See Minott v. Google LLC, 2024 WL 3518525, at *4 (explaining a court may use a retainer agreement as "guidance" in evaluating quantum meruit factors).

Here, the retainer agreement provides Schlanger "may opt to receive compensation on an hourly basis . . . OR [Schlanger] may opt to receive a sum equal to 30% of any amount recovered" in the litigation. (Retainer at ECF 2). Using the rates in the retainer agreement, Schlanger has billed ██████████ in this litigation. Pursuant to the terms of the retainer

---

[6]    Mr. Schlanger received his J.D., cum laude, from Harvard Law School in 2004, after which he served as a law clerk to the Hon. R. Lanier Anderson III, on the Eleventh Circuit. (Doc. #343 at 2). Evan Rothfarb, another partner at Schlanger, received his J.D. from Cornell Law School in 2005, after which he served as a law clerk to the Hon. James Knoll Gardner in the Eastern District of Pennsylvania. (Doc. #333-6). Schlanger associate Arjun Shah received his J.D. from Emory University School of Law in 2012. (Doc. #333-7). Mr. Lupkin received his J.D. from the Columbia University School of Law in 1992 and served as a law clerk to the Hon. Edward R. Korman in the Eastern District of New York. (Doc. #348 at ECF 6). And Mr. Lupkin's associate, Carol Shahmoon, graduated jointly from Columbia College and Columbia University School of Law in 1992 after completing the Accelerated Interdisciplinary Legal Education program, summa cum laude. (Id. at ECF 7).

agreement, Schlanger is entitled to be compensated in that amount.  Following plaintiff's

███████ settlement with the Credit Reporting Agency Defendants, Schlanger received

███████.  Meaning, Schlanger has still not been paid for ███████ worth of legal work.

Indeed, if Schlanger is granted the full amount of the charging lien it will receive ██████ total,

which is ██████ less than what it billed.  Therefore, viewed in the context of the retainer

agreement, the amount of Schlanger's desired charging lien is reasonable.

    B.    <u>Lodestar</u>

Schlanger's requested lien amount is also reasonable using the lodestar method

"calculated by multiplying the number of hours reasonably billed by the appropriate hourly rate,"

where the hourly rate is determined by "look[ing] to rates prevailing in the community."

<u>Hampshire Grp. Ltd. v. Scott James, Co. L.L.C.</u>, 2015 WL 5306232, at *16–17.

Schlanger and Lupkin expended a total of 1,754 hours across five attorneys and eight

paralegals.  (Docs. ##333-9 at 73, 343 at 9).  Schlanger's billing accounts for three attorneys—

Mr. Schlanger, Evan Rothfarb, and Arjun Shah—as well as the paralegals.  (Doc. #333-9 at 73).

Lupkin's billing accounts for two attorneys, Mr. Lupkin and Carol Shahmoon.  (<u>Id</u>.).

Schlanger and Lupkin's requested hourly rates are as follows:  $600 per hour for Mr.

Schlanger and Mr. Lupkin; $550 per hour for Rothfarb; $490 per hour for Shahmoon; $450 per

hour for Shah; and $200 per hour for the Schlanger paralegals.  (Doc. #333-9 at 73).[7]  These

billing rates are reasonable.  In fact, plaintiff agreed to these rates in the retainer agreement,

---

[7]    Schlanger presents its billing summary using both its 2020 rates, which were provided in the retainer agreement, and its 2025 rates.  (Doc. #333-9 at 73).  Using the 2020 rates, Schlanger and Lupkin's work resulted in a total fee of ██████, and using 2025 rates, their work resulted in a total fee of ██████.  (<u>Id</u>. at 73–74).  Because Schlanger seeks to fix the charging lien at ██████—markedly less than what Schlanger and Lupkin billed using either rate—the Court need not determine whether the 2020 or 2025 rate applies.  Thus, for clarity, the Court refers to the 2020 rate throughout.

which provided partners could be billed at a rate of $500–$600 per hour; associates and counsel at $350–490 per hour; and paralegals and support staff at $180–$200 per hour. (Retainer at ECF 2). Moreover, these rates are below the standard hourly rates charged by FCRA attorneys. For example, Mr. Lupkin currently charges $1,600 per hour and Shahmoon charged $900 per hour while in private practice. (Doc. #348 at ECF 8). In addition, declarations submitted in support of Schlanger's motion explain that it is customary for attorneys in consumer protection matters in the district to be paid a rate of $600–$1,150 per hour for partners; $550–$575 per hour for associates, and $300–$335 per hour for paralegals. (Id. at ECF 13–14, 17, 27, 32).

Crucially, Schlanger's requested ██████ for 1,754 hours of work amounts to an average billing rate of approximately ████ per hour, which is significantly below the rates agreed to in the retainer agreement or commonly charged in such cases. Together with the ██████ Schlanger has already received, the sought lien thus represents a nearly 35% reduction of the amount billed to plaintiff's case.

The Court has also carefully reviewed Schlanger and Lupkin's time entries, which reflect Mr. Schlanger billed 391.8 hours of work; Mr. Lupkin billed 126.9 hours of work; Rothfarb billed 6.5 hours of work; Shahmoon billed 288 hours of work; Shah billed 701.5 hours of work; and the paralegals billed 239.9 hours of work in connection with this matter. For a case that spanned four years, included successful summary judgment briefing, and resulted in four successful settlements for plaintiff, these hours are also reasonable.

Therefore, the Court finds Schlanger's sought charging lien of ██████ is a presumptively reasonable fee.

C.    Plaintiff's Remaining Arguments

Plaintiff raises several other arguments which appear to be attempts to create factual issues to prevent the Court from ruling on Schlanger's motion. These arguments fail to persuade the Court Schlanger should not be awarded the charging lien in the amount sought.

First, plaintiff complains Schlanger failed to send her a written account of its fees and costs until February 2024, to provide her with invoices in her preferred format, or to send her case files in a manner she could access. (Doc. #351 at 4–6). Although the retainer agreement provided plaintiff was "entitled to request and receive a written itemized bill from [Schlanger] at reasonable intervals" (Retainer at ECF 5), plaintiff did not request a written itemized bill until January 27, 2024. (Doc. #361 at 5). Schlanger then provided plaintiff with the requested billing records on February 1, 2024. (Id.). Moreover, Schlanger cites evidence showing plaintiff and Mr. Schlanger discussed attorneys' fees throughout the case, including as plaintiff was making settlement decisions. (Docs. ##343-7 at ECF 3, 294-3).

In addition, plaintiff's complaint that Schlanger refused to collate its billing entries into "chronological invoices itemized in reasonable intervals, monthly or quarterly" has no bearing on the amount of Schlanger's charging lien. (Doc. #351 at 4–5). Nor does her complaint that, after she requested her case files, Mr. Schlanger provided the files to her on "thumb drives" which she contends are "not a secure way to receive files from adverse parties." (Id. at 6). Schlanger is not required to pay to print thousands of pages of case files for plaintiff. Transferring files via thumb drive is secure and sufficient and, in any event, has no bearing on the amount of the charging lien.

Plaintiff also alleges Schlanger and Lupkin "withheld" their co-counsel agreement until February 2024, and the co-counsel agreement "superseded" plaintiff's retainer agreement with

Schlanger. (Doc. #351 at 7). Schlanger admits to failing to disclose its co-counsel agreement with Lupkin to plaintiff due to a clerical error. (Doc. #361 at 7). Although this error was not best practice, it was not material. The 2020 retainer agreement authorizes Schlanger to retain co-counsel on plaintiff's behalf at Schlanger's discretion and without further notice. (Retainer at ECF 3). Schlanger and Lupkin entered into the co-counsel agreement on September 2, 2021. (Doc. #360-3). On November 30, 2021, Schlanger associate, Arjun Shah, emailed plaintiff to introduce her to Mr. Lupkin, describing him as "our lead trial counsel." (Doc. #360-1 at ECF 2). Thus, although the formal co-counsel agreement was not timely disclosed to plaintiff, she was made aware Lupkin was involved in her case within three months of the execution of the co-counsel agreement.

Moreover, plaintiff's contention that the co-counsel agreement "superseded" the retainer agreement is simply wrong. Plaintiff's confusion appears to arise from a clause in the co-counsel agreement, which provides that the co-counsel agreement "is the entire agreement between the Parties, and it supersedes any previous negotiations, agreements and understandings." (Docs. ##351 at 7–8294, 360-3 at ECF 3). First, the reference to "parties" in this clause is to the parties to the co-counsel agreement, namely, Schlanger and Lupkin. Moreover, the clause means simply that any prior terms of the co-counsel agreement Schlanger and Lupkin may have discussed prior to executing the agreement is superseded by the final co-counsel agreement. The co-counsel agreement, to which plaintiff is not a party, does not supersede plaintiff's retainer agreement with Schlanger. Plaintiff also raises concerns regarding the provision in the co-counsel agreement that addresses the distribution of funds between Schlanger and Lupkin. (Docs. ##351 at 11, 360-3 at ECF 2–3). This provision is irrelevant to the instant motion. Schlanger is not entitled to any

14

greater fee amount because of the co-counsel agreement.  Instead, it provides only for how Schlanger and Lupkin should disburse the fees among themselves.

**CONCLUSION**

Schlanger's motion to fix the amount of the charging lien at ███ is GRANTED.

Defendant JPMorgan Chase Bank, N.A., is directed to pay that amount to Schlanger directly, and to pay the remaining ███ to plaintiff directly.

The Clerk is instructed to terminate the motion.  (Docs. ##331, 341, 345).

Chambers will mail a copy of this Order to plaintiff at the address on the docket and email a copy to lombardct@yahoo.com.

Dated: April 8, 2026
      White Plains, NY          SO ORDERED:

Vincent L. Briccetti
United States District Judge